IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| William K.,  )<br>  )<br>    Plaintiff,  )<br>  )<br>      v.  )<br>  )<br>Kilolo Kijakazi,  )<br>Commissioner of Social Security,[1]  )<br>  )<br>    Defendant.  ) | Case No.: 20-cv-50462<br><br>Magistrate Judge Margaret J. Schneider |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William K. ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for supplemental security income. The parties have filed cross motions for summary judgment. [17, 24]. As detailed below, Plaintiff's motion for summary judgment [17] is denied and the Commissioner's motion for summary judgment [24] is granted.

**BACKGROUND**

A.  Procedural History

On December 12, 2017, Plaintiff filed an application for Social Security disability insurance benefits under Title II of the Social Security Act. R. 13. He alleged a disability beginning on June 1, 2017. *Id.* The Commissioner denied his application on April 6, 2018, and upon reconsideration on July 31, 2018. R. 100, 105. Plaintiff filed a written request for a hearing on August 21, 2018. R. 111–12. On July 16, 2019, a hearing was held by Administrative Law Judge ("ALJ") Patricia Kendall where Plaintiff appeared and testified. R. 28–74. Plaintiff was represented by counsel. *Id.* Medical expert Tiffany Sanders, M.D., and vocational expert Susan Entenberg appeared and testified. *Id.*

On January 6, 2020, the ALJ issued her written opinion denying Plaintiff's claims for disability insurance benefits. R. 13–23. Plaintiff appealed the decision to the Appeals Council and the Appeals Council denied Plaintiff's request for review. R. 1–6. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). The parties have consented to the jurisdiction of this Court. *See* 28 U.S.C. § 636(c); [6]. Now before the Court are Plaintiff's motion for summary judgment [17] and the Commissioner's cross-motion for summary judgment and response to Plaintiff's motion for summary judgment [24].

---

[1] Kilolo Kijakazi has been substituted for Andrew Saul. Fed. R. Civ. P. 25(d).

B. The ALJ's Decision

The ALJ conducted the statutorily required five-step analysis to determine whether Plaintiff was disabled under the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4). At step one of the five-step analysis, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since June 1, 2017, when Plaintiff alleges his disability arose. R. 15. At step two, the ALJ found that Plaintiff suffered from the severe impairments of degenerative disc disease of the cervical spine and osteoarthritis of the right knee. R. 15–16. The ALJ found that these impairments more than minimally limited Plaintiff's ability to perform basic work activities. *Id*. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 17.

Before moving to step four, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform medium work subject to only occasionally kneeling, crawling, and reaching overhead. R. 17. At step four, the ALJ found that Plaintiff could not perform any past relevant work. R. 21–22. Finally, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs in the national economy that Plaintiff could perform, including janitor, dishwasher, and bagger. R. 22–23. For these reasons, the ALJ concluded that Plaintiff was not disabled under the Social Security Act from June 1, 2017, to January 6, 2020, the date of the decision. R. 23.

**STANDARD OF REVIEW**

The Court reviews the ALJ's determination to establish whether it is supported by "substantial evidence," meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is "more than a mere scintilla." *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "Whatever the meaning of 'substantial' in other contexts, the Supreme Court has emphasized, 'the threshold for such evidentiary sufficiency is not high.'" *Id*. (quoting *Biestek*, 139 S.Ct. at 1153). The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

The Court is obligated to "review the entire record, but [the Court does] not replace the ALJ's judgment with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. [The Court's] review is limited also to the ALJ's rationales; [the Court does] not uphold an ALJ's decision by giving it different ground to stand upon." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). "An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). Nor can ALJs "succumb to the temptation to play doctor and make their own independent medical findings," *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), or

"rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). The Court will only reverse the decision of the ALJ "if the record compels a contrary result." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (citations and quotations omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred in her RFC analysis by finding Plaintiff capable of "medium work" and by not finding Plaintiff to suffer from the severe impairment of Lyme disease. The Court finds neither of these arguments persuasive.

In determining that Plaintiff had an RFC for medium work, the ALJ largely adopted the opinions of the non-examining state agency medical consultants. On April 5, 2018, state-agency medical consultant Marion Panepinto, M.D., opined that based on his review of the medical record Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. R. 81–82. Based on these findings, he concluded that Plaintiff could perform medium work. R. 83. On July 4, 2018, Douglas Chang, M.D., concurred on reconsideration with Dr. Panepinto's findings. R. 92–94. The ALJ found these non-reviewing state-agency consultants' opinions to be "partially persuasive" regarding Plaintiff's limitations and "the most persuasive assessment of record as a whole." R. 21. Plaintiff alleges that the ALJ erred in finding these opinions persuasive because later evidence rendered their opinions outdated.

An ALJ may rely on the opinions of state-agency medical consultants and may even credit the opinions of non-treating consultants over those of a treating physician. *Lisa S. v. Saul*, No. 19 C 862, 2020 WL 5297028, at *14 (N.D. Ill. Sept. 4, 2020). New evidence alone does not change this, since "if an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end." *Keys v. Berryhill*, 679 Fed. Appx. 477, 481 (7th Cir. 2017) (internal citation omitted). However, an ALJ may not rely on a reviewing physician's assessment if "later evidence containing new, significant medical diagnoses 'changed the picture so much' that it reasonably could have changed the reviewing physician's opinion." *Massaglia v. Saul*, 805 F. App'x 406, 410 (7th Cir. 2020) (quoting *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). *See Kemplen v. Saul*, 844 Fed. Appx. 883, 887 (7th Cir. 2021) ("The issue, then, comes down to whether the new information 'changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by the non-examining physician and by evaluating himself the significance of [the subsequent] report', or whether the updated information was minor enough that the ALJ did not need to seek a second opinion."); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'") (quoting *Moreno*, 882 F.3d at 728).

Plaintiff describes the evidence post-dating Dr. Chang's review of the medical record on reconsideration as additional appointments concerning Plaintiff's right knee pain and continued neck pain treated with naproxen, subtle balance difficulties, continued cervical myelopathy treated by facet joint injections, a finding of a reduced range of motion in Plaintiff's back, and continued

3

treatment for Lyme disease. [17, p 9–10]. Of these post-review developments, Plaintiff only addresses how two may have changed the state agency consultants' opinions. He argues that the records documenting the bilateral cervical facet joint injections and lack of success of the naproxen regimen are significant, because Dr. Chang referenced in his assessment a physician's April 2018 finding that Plaintiff was "not disabled as to his right knee" because he has not engaged in certain "nonsurgical treatment options." [17, at p. 9], R. 93. He further argues that his second positive Western blot test and continued treatment for Lyme disease at Serenity Health Care Center could have also changed the state-agency consultants' opinions.

Plaintiff has failed to demonstrate how either of those developments "changed the picture so much" as to be reasonably expected to have changed either state agency medical consultants' opinion. As discussed in further detail below, Plaintiff's other medical providers did not consider Plaintiff's Lyme disease testing and treatment at Serenity Health Care Center to be medically sound. Both Dr. Panepinto and Dr. Chang addressed Plaintiff's pain reports in their opinions. Dr. Chang discussed Plaintiff's complaints of neck, shoulder, and right knee pain and noted that while prescribed naproxen for his pain, Plaintiff had been failing to take that medication. R. 93. Plaintiff provides little in the way of argument as to why the effectiveness of a pain drug which the reviewing medical consultants knew to have been prescribed to Plaintiff would have changed their opinions regarding Plaintiff's capabilities. On May 29, 2018, Plaintiff received injections in both cervical facet joints in a single procedure performed at the Rockford Pain Center to treat his ongoing axial neck pain. R. 650–51. While Dr. Panepinto and Dr. Chang were not able to review the records of these injections, the neck pain the procedure sought to treat was well-documented in the medical records they reviewed. The "nonsurgical treatment options" note referenced by Dr. Chang referred to Plaintiff's right knee pain, not to this neck pain. Plaintiff does not offer much in the way of explanation as why these facet joint injections, a single procedure, would meaningfully change that analysis.

While Plaintiff argues that the ALJ's narrative discussion of Plaintiff's symptoms was inadequate, the ALJ provides a substantial discussion of the medical evidence both as it relates to the alleged severe impairment, R. 16–17, and as it relates to the RFC. R. 18–21. "To require the ALJ to repeat such a discussion throughout his decision would be redundant." *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). Though Plaintiff asserts that the ALJ provided "just two paragraphs of commentary on the RFC," [17, at p. 9], those referenced paragraphs conclude a three-page discussion of the medical record and Dr. Sanders's testimony which includes the ALJ's assessment of the consistency of Plaintiff's allegations and Dr. Sanders' testimony with the medical record. R. 18–21. In this discussion, the ALJ described in detail a conservative course of treatment for Plaintiff's pain symptoms which included medications, chiropractic treatments, and physical therapy. R. 18–20. In doing so, the ALJ noted that Plaintiff underwent "a single facet injection in May 2018" and that Plaintiff reported an improvement in his pain symptoms at his 2018 chiropractor visits following that procedure with the exception of a September flare-up. R. 20. Some of the specific medical evidence which Plaintiff claims that the ALJ failed to address—such as the facet joint injections and the July 2017 x-ray of Plaintiff's knee, R. 18, [17, at p. 12] —are included in the ALJ's narrative description in connection with her RFC analysis. While the ALJ interpreted these medical records as showing less severe conditions than Plaintiff interprets them, the ALJ did consider them. It is not the Court's role to "substitute its judgment for the ALJ's

4

by reweighing the evidence." *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). The ALJ's RFC analysis was supported by substantial evidence.

Plaintiff's argument that the ALJ erred by not finding that Plaintiff's Lyme disease constituted a severe impairment is two-fold. First, Plaintiff contends that the ALJ should have called a Lyme disease specialist to testify, since the testifying medical expert Dr. Sanders admitted her lack of knowledge about Lyme disease. Second, Plaintiff argues that without this medical expert testimony the ALJ impermissibly played doctor in disregarding the evidence supporting Plaintiff's Lyme disease diagnosis. Neither argument is successful.

The evidence Plaintiff cites to support a Lyme disease diagnosis comes from his treatment at Serenity Health Care Center ("Serenity") in Waukesha, Wisconsin. On June 20, 2017, Plaintiff saw Amy Hoffman at Serenity and expressed his belief that he suffered from Lyme disease. He stated that both his friend and his dog had Lyme disease and that his sister had Lyme disease which had been misdiagnosed as MS. *Id*. After being informed of the controversy about Lyme disease in the medical community, Plaintiff elected to proceed with the diagnostic criteria and treatment recommendations of the International Lyme and Associated Disease Society. R. 470. Hoffman told Plaintiff that contrary to the common belief expressed in medical literature, false positives on the IgM Western blot tests were rare. R. 470. Plaintiff underwent a Western blot test pursuant to Serenity's criteria and was prescribed treatment for Lyme disease. R. 470. On August 29, 2017, Plaintiff returned to Serenity and discussed with Hoffman his positive IgM Western blot test. R. 473. Plaintiff reported that "[h]is symptoms have all gotten worse on Lyme treatment" and Hoffman modified his treatment regimen. R. 472–73. During follow-up appointments at Serenity with Erica Lynn, Plaintiff regularly reported fatigue symptoms and his Lyme treatment regimen was frequently modified in response to this fatigue and other symptoms. On July 19, 2018, Lynn reviewed with Plaintiff, the results of his new Western blot test which showed that he still had "positive IgM bands and some IgG but a weaker response." R. 498.

"An ALJ may obtain a medical expert's opinion for several reasons including, in relevant part, 'to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing' and to determine the claimant's residual functioning capacity." *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020) (citation omitted). A medical expert does not need to be a specialist in the particular impairment alleged by a claimant in order for their evidence to be credited. *See Yarolem v. Berryhill*, No. 17 CV 50096, 2018 WL 4030592, at *2 (N.D. Ill. Aug. 23, 2018) ("Plaintiff has not cited to any authority that would preclude a doctor from testifying in a Social Security administrative hearing about medical issues outside of his specialty or practice area[, i]ndeed, the case law is contrary.").

The ALJ retained Dr. Sanders to testify as a medical expert at the hearing. She offered her expert testimony in regard to Plaintiff's medical conditions and RFC without identifying a specific area of expertise. Plaintiff's counsel did not object to her qualifications to serve as a medical expert. R. 59–60. When asked if she found support for a Lyme disease diagnosis, Dr. Sanders testified that the evidence was "indeterminate." R. 63. On further questioning from the ALJ, she stated that she did not know what the evidence meant: "[j]ust, there was some evidence for it per the physicians at Serenity[; b]ut their testing is different from what other physicians would do to test for Lyme disease." *Id*. She testified that while a primary care physician would not use the test used

5

at Serenity, it was an acceptable test used by "some physicians who do specialize in Lyme disease." R. 64. When questioned by Plaintiff's counsel, Dr. Sanders testified to "controversy in the medical community" regarding Lyme disease. R. 67. She stated that "a lot of practitioners are under the belief that Lyme disease is an infectious disease that's treatable with medication [and that o]nce the treatment is complete, the infection has resolved," but that others believe in "chronic Lyme disease, that causes ongoing symptoms such as joint complaint and fatigue, et cetera" which "has not been fully proven or disproved." R. 67. Dr. Sanders stated that "generally speaking, Lyme disease would be a treatable disease and within a few months, the person would go back to their normal way of being." *Id*. Dr. Sanders declined to opine as to whether Plaintiff's treatment at Serenity was for chronic Lyme disease. R. 68.

After discussing Plaintiff's history of testing for Lyme disease and his treatment for Lyme disease at the alternative medicine clinic, the ALJ concluded in her decision that Plaintiff's "consistently negative laboratory testing and the multiple medical providers who have noted he does not have Lyme disease, does not support that [Plaintiff's] alleged history of Lyme disease is a medically determinable impairment despite being treated for it with alternative therapies." R. 16. Plaintiff asserts that the ALJ discounted the Lyme disease diagnosis, because she decided to "play doctor" in the absence of a medical opinion from a Lyme disease specialist. Yet, the ALJ did not interpret the medical record herself, she adopted the opinions of the non-testifying experts and Plaintiff's other medical providers.[2] In making his argument that the ALJ should have sought out a Lyme disease expect, Plaintiff overstates the conflict in the medical record.

Plaintiff was diagnosed with Lyme disease not by a specialist on referral by his primary care physician, but only by the staff at Serenity, an institution whose methods and results were distrusted by Plaintiff's other medical providers. Outside of Serenity Plaintiff consistently tested negative for Lyme disease. The June 30, 2017 Lyme antibody screening test ordered by Kristin Reese, P.A.C. came back negative. R. 340, 347, 356. In February 2018, after Plaintiff's treatment at Serenity began, Reese "reiterated to [Plaintiff] that we do not continue to pursue a Lyme[] disease diagnosis when the testing is negative." R. 416. In April 2018, Reese again requested Lyme disease testing at Plaintiff's request. R. 415. In May 2018, Reese again explained to Plaintiff that "all of our testing is negative" for Lyme disease. R. 411. In March 2019, Plaintiff's treating physician David Mitchell, M.D., ordered further Lyme disease testing that again came back negative. R. 780–81. On April 8, 2019, Dr. Mitchell wrote of Plaintiff:

> He is going to some sort of Wellness Clinic in Wisconsin, and despite multiple negative tests in the past for Lyme Disease, their testing and counseling has him convinced that his chronic neck pain is from Lyme Disease, and he is on Rocephin injections twice weekly 'until I am better.' I told him I thought their testing and treatment recommendations are inappropriate and potentially harmful. He indicates he is going to continue with their treatment recommendations because they are the only ones who have 'found anything wrong' to explain his chronic neck pain. R. 732.

While Dr. Sanders testified to her inability to speak to Plaintiff's Lyme disease diagnosis,

---

[2] The Commissioner notes in her brief that neither Hoffman nor Lynn are medical doctors. [24, p. 4]. While Plaintiff's opening brief refers to a "doctor at Serenity Health Care Center" as treating Plaintiff for Lyme disease, it does not identity this doctor. [*See* 17, at p. 14].

6

the other medical experts who reviewed Plaintiff's medical record in connection with his application found that Plaintiff did not suffer from Lyme disease. When examining Plaintiff, K.P. Ramchandani, M.D., noted that he "claims to have been diagnosed with Lyme disease by a physician in Wisconsin, however tests run by his current family physician have been negative for Lyme disease." R. 399. In his report, Dr. Ramchandani recorded the impression: "negative workup for Lyme disease." R. 401. After reviewing Plaintiff's medical records—including treatment records from Serenity regarding his testing and treatment—neither Dr. Panepinto nor Dr. Chang found Lyme disease to be a medically determinate impairment. R. 80, 91. Dr. Chang explained that while Plaintiff believes he suffers from Lyme disease, all tests were negative. R. 93.

Plaintiff argues that the ALJ's finding that the negative laboratory testing was consistently negative represents a clear error, because it ignores the positive tests administered at Serenity. The ALJ discussed the 2017 Serenity testing as finding that the "[d]iagnostic testing was negative, but the evaluator opined that claimant could still have Lyme with a negative test and recommended treatment in spite of no clear indication had Lyme disease." R. 16. In doing so, the ALJ does seem to have mischaracterized Serenity's findings. However, though the test was positive according to the criteria employed at Serenity, it was not positive based on the standards of others in the medical community. "An error is harmless if, upon examination of the record, the court can 'predict with great confidence what the result of remand will be.'" *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) (quoting *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021)). As "the harmless error standard applies to judicial review of administrative decisions," a court will not remand a case to the ALJ if "convinced that the ALJ will reach the same result." *Id.* (quoting *Butler*, 4 F.4th at 504). Any mischaracterization by the ALJ of the Serenity staff's assessment of Plaintiff's test results was harmless because the results were interpreted as negative by Plaintiff's treaters outside of those at Serenity and the state agency consultants who reviewed the record.

"[T]he resolution of competing arguments based on the record is for the ALJ, not the court." *Matthews v. Saul*, 833 F. App'x 432, 437 (7th Cir. 2020)(quoting *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002))."[I]f the ALJ [made] a reasoned choice between the disparate medical findings," that determination is "beyond our review because of the deference afforded the ALJ's decisions." *Gaylor v. Astrue*, 292 F. App'x 506, 512 (7th Cir. 2008). *See Wilson v. Berryhill*, 737 F. App'x 286, 290 (7th Cir. 2018) (finding that when medical providers disagree, "[a]n ALJ has substantial discretion regarding which doctor to believe" so long as "the ALJ gave suitable reasons for acting within that discretion"). Dr. Mitchell, his treating physician, and Reese, his treating physician assistant, state unequivocally in their treatment notes that Plaintiff does not suffer from Lyme disease. Dr. Panepinto, and Dr. Chang reviewed the medical record including descriptions of Plaintiff's Western blot test and Lyme disease treatment at Serenity and concluded that Plaintiff does not suffer from Lyme disease. Based on the information provided to him, Dr. Ramchandani deemed Plaintiff to have tested negative for Lyme disease. With these interpretations of the medical record available to her, the ALJ did not abuse her discretion by declining to seek out the expert opinion of a Lyme disease specialist. The Court does not find that she improperly "played doctor" by adopting a conclusion well-supported by the medical record and shared by Plaintiff's primary care physician and the reviewing state agency medical consultants. The ALJ's finding that Lyme disease was not a medically determinable impairment was supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [17] is denied and the Commissioner's motion for summary judgment [24] is granted.

Date: 05/17/2023　　　　　　　　　ENTER:

　　　　　　　　　　　　　　　　　_Margaret J. Schneider_
　　　　　　　　　　　　　　　　　United States Magistrate Judge